# JS-6

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **EDCV 20-2324 JGB (SPx)** | Date | May 18, 2023 |
| Title | ***Tammy La Barbera v. Olé Mexican Foods Inc.*** | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:    **Order (1) GRANTING Defendant's Motion to Dismiss (Dkt. No. 69); (2) DENYING AS MOOT Plaintiff's Application to File Under Seal (Dkt. No. 78), Plaintiff's Motion for Class Certification (Dkt. No. 80), and Defendant's Motion to Exclude (Dkt. No. 89); and (3) VACATING the May 22, 2023 Hearing (IN CHAMBERS)**

Before the Court is a motion to dismiss Plaintiff's first amended complaint filed by Defendant Olé Mexican Foods ("Defendant" or "Olé"). ("Motion," Dkt. No. 69.) The Court determines this matter is appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering the papers filed in support of and in opposition to the Motion, the Court **GRANTS** the Motion and **VACATES** the May 22, 2023 hearing.

## I.    BACKGROUND

On November 6, 2020, Plaintiff Juan De Dios Rodriguez filed a putative class action complaint against Olé. ("Complaint," Dkt. No. 1.) The Complaint alleged four causes of action: (1) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, et seq.; (2) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, et seq.; (3) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq.; and (4) breach of implied warranty under Cal. Com. Code § 2314. (Id.)

On December 22, 2020, Defendant filed a motion to dismiss the Complaint. ("MTD Complaint," Dkt. No. 13.) Mr. Rodriguez filed an opposition on January 29, 2021. ("MTD Complaint Opposition," Dkt. No. 17.) Defendant replied on February 19, 2021. ("Reply ISO

MTD Complaint," Dkt. No. 18.)  On April 22, 2021, the Court denied the MTD Complaint. ("MTD Complaint Order," Dkt. No. 26.)

On May 6, 2021, Defendant filed an answer.  ("Answer," Dkt. No. 27.)  On September 21, 2021, the Court issued its Civil Trial Scheduling Order.  ("Scheduling Order," Dkt. No. 32.)

On November 22, 2022, Mr. Rodriguez filed a motion to modify the Scheduling Order and for leave to file a first amended complaint.  ("Motion for Leave," Dkt. No. 58.)  The primary purpose of the Motion for Leave was to substitute Tammy La Barbera as a named plaintiff and putative class representative for Mr. Rodriguez.  (See id.)  On December 19, 2022, Defendant opposed the Motion for Leave.  (Dkt. No. 60.)  On December 26, 2022, Mr. Rodriguez replied. (Dkt. No. 61.)  On January 9, 2023, Plaintiff filed a notice of Mr. Rodriguez's death.  (Dkt. No. 63.)  The same day, the Court granted the Motion for Leave.  ("Motion for Leave Order," Dkt. No. 64.)

On January 10, 2023, Ms. La Barbera filed a first amended complaint.  ("FAC," Dkt. No. 65.)  The FAC asserts the same core factual allegations and identical causes of action as the Complaint.  (See id.)

On January 24, 2023, Defendant filed the Motion.  (Motion.)  In support of the Motion, Defendant filed a declaration of Edgar Moreno ("Moreno Declaration," Dkt. No. 69-2), a request for judicial notice ("RJN," Dkt. No. 69-7) and four exhibits ("Exhibits A-D," Dkt. Nos. 69-3-6.)  On February 6, 2023, Plaintiff filed an opposition.  ("Opposition," Dkt. No. 70.)  On February 13, 2023, Defendant replied.  ("Reply," Dkt. No. 71.)  On February 24, 2023, Plaintiff filed a Request to Strike New Arguments Raised in Defendant's Reply Breif [sic] or for Leave to File Sur-Reply.  ("Request," Dkt. No. 73.)

On March 13, 2023, Plaintiff filed an application for leave to file portions of Plaintiff's class certification brief under seal.  ("Application to File Under Seal," Dkt. No. 78.)  The same day, Plaintiff filed a motion for class certification.  ("Motion for Class Certification," Dkt. No. 80.)  On April 17, 2023, Defendant filed an opposition to the Motion for Class Certification. ("Class Certification Opposition," Dkt. No. 87.)  On May 8, 2023, Plaintiff replied in support of the Motion for Class Certification.  ("Reply ISO Motion for Class Certification," Dkt. No. 92.) On May 15, 2023, Plaintiff filed a notice of errata and revision to the Reply ISO Motion for Class Certification.  (See Dkt. Nos. 96, 97.)

On April 28, 2023, Defendant filed a motion to exclude Plaintiff's expert report and testimony of J. Michael Dennis, PhD.  ("Motion to Exclude," Dkt. No. 89.)  On May 15, 2023, Plaintiff opposed the Motion to Exclude.  ("Motion to Exclude Opposition," Dkt. No. 98.)

On May 10, 2023, the Court granted in part and denied in part the Request, denying the request to strike any arguments raised in the Motion but granting Plaintiff leave to file a sur-reply by May 15, 2023.  ("Request Order," Dkt. No. 94.)  The Court continued the hearing on the

Motion from May 15, 2023 to May 22, 2023.  (Id.)  On May 15, 2023, Plaintiff filed a sur-reply in opposition to the Motion.  ("Sur-Reply," Dkt. No. 97.)

## II.   FACTS

### A.  Allegations in FAC

Plaintiff alleges the following facts, which are assumed to be true for purposes of the Motion, except those contradicted by the facts of which the Court has taken judicial notice.  See Mullis v. U.S. Bankr. Court, 828 F.2d 1385, 1388 (9th Cir. 1987); Marder v. Lopez, 450 F.3d 445, 448 (9th Cir. 2006); Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir.), opinion amended on denial of reh'g, 275 F.3d 1187 (9th Cir. 2001).

"Tortillas are a staple of Mexican cuisine and are considered to have originated in Mexico.  The people of Mexico have a long history with tortillas and are generally credited with having perfected the art of making them."  (FAC ¶ 3.)  "Because of this, consumers value tortilla products that are authentically made in Mexico."  (Id. ¶ 4.)

Defendant Olé Mexican Foods, Inc. is based in Norcross, Georgia.  (Id. ¶ 11.)  It sells a line of products under the name La Banderita, available at grocery retailers in California, which includes tortillas, chorizo, chips, and salsas.  (Id.)  This action concerns the following tortilla products: La Banderita Burrito Grande, La Banderita Sabrosísimas Corn, La Banderita Sabrosísimas Flour, and La Banderita Whole Wheat Fajita (the "Products").  (Id. ¶ 1.)  Defendant is responsible for the manufacturing, packaging, marketing, distribution, and sale of the Products in California.  (Id. ¶ 11.)

Plaintiff Tammy La Barbera ("Ms. La Barbera"), who resides in Murrieta, California, purchased La Banderita Burrito Grande flour tortillas at Sam's Club in Murrieta on or about September 2022.  (Id. ¶ 8.)  Plaintiff saw and relied on Defendant's references to the Mexican flag, the phrase "El Sabor de Mexico!" or "A Taste of Mexico!", the brand name "La Banderita," the circular logo with the Mexican flag and the word "Authentic."  (Id.)  Based on these representations, Plaintiff believed she was purchasing tortillas made in Mexico.  (Id. ¶ 9.)  However, the Products are not made in Mexico.  (Id.)  Ms. La Barbera would not have purchased the Products or would have paid significantly less for them had she known that they were not made in Mexico.  (Id.)

Regardless of size or variety, all the Products contain the same representations concerning Mexican origin: (a) the phrase "El Sabor de Mexico!" or "A Taste of Mexico!"; (b) a Mexican flag on the front and center of the packaging; and (c) the brand name "La Banderita" (or "the flag"), a reference to the Mexican flag displayed prominently on the Products.  (Id. ¶ 15.)  Some of the Products also contain a circular logo with the Mexican flag and the word "Authentic."  (Id. ¶ 16.)  Several Products also contain Spanish words or phrases, such as "Sabrosísimas" or "Tortillas de Maiz."  (Id.)  "The foregoing representations, taken in isolation

and as a whole, create the misleading impression that the Products are made in Mexico, when they are not." (Id. ¶ 17.)

Plaintiff alleges that Defendant deceptively labeled and packaged the Products to target consumers who are interested in purchasing tortillas and other products from Mexico. (Id. ¶ 20.) Plaintiff brings this case on behalf of California citizens who purchased any of the Products within the relevant statute of limitations periods. (Id. ¶¶ 27-28.)

Plaintiff (deliberately) omits material facts from the FAC: all the Products clearly and prominently say "MADE IN U.S.A." on the back of the respective package. (See RJN.) All the Products also clearly state they were "Manufactured by: Olé Mexican Foods, Inc., Norcross, GA 30071" on the back. (See id.)

## B. Request for Judicial Notice

Defendant requests judicial notice of four documents:

- Images depicting the packaging for Defendant's La Banderita Burrito Grande Flour Tortillas product, as it appeared in September 2022 (Ex. A);
- Images depicting the packaging for Defendant's La Banderita Sabrosisimas Corn product, as it appeared in September 2022 (Ex. B);
- Images depicting the packaging for Defendant's La Banderita Sabrosisimas Flour product, as it appeared in September 2022 (Ex. C); and
- Images depicting the packaging for Defendant's La Banderita Whole Wheat Fajita product, as it appeared in September 2022 (Ex. D).

(See RJN.)

Exhibits A through D are properly subject to judicial notice because they are incorporated by reference into the FAC and Defendant establishes their authenticity through the Moreno Declaration; moreover, their authenticity is not disputed and the RJN is unopposed. See Knievel v. ESPN, 393 F.3d 1068, 1076 (2005); United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003); Shalikar v. Asahi Beer U.S.A., Inc., 2017 WL 9362139, at *2 (C.D. Cal. Oct. 16, 2017). Courts regularly take judicial notice of images of product packaging when evaluating the sufficiency of false advertising claims. See, e.g., Angiano v. Anheuser-Busch InBev Worldwide, Inc., 532 F. Supp. 3d 911, 917 (C.D. Cal. 2021) (taking judicial notice of label and packaging of beverages at issue); Pelayo v. Nestle USA, Inc., 989 F. Supp. 2d 973, 977 n.3 (C.D. Cal. 2013) (taking judicial notice of pasta labeling at issue); Hadley v. Kellogg Sales Company, 243 F. Supp. 3d 1074, 1087 (N.D. Cal. 2017) (taking judicial notice of image of Raisin Bran packaging at issue). The Court GRANTS Defendant's RJN.

//
//
//

**CIVIL MINUTES—GENERAL**

### III.   LEGAL STANDARD

**A. Rule 12(b)(1)**

"A jurisdictional challenge under Rule 12(b)(1) may be made either on the face of the pleadings or by presenting extrinsic evidence." Warren v. Fox Fam. Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir. 2003). Thus, a jurisdictional challenge can be either facial or factual. White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000).

In a facial attack, the moving party asserts that the allegations contained in the complaint are insufficient on their face to invoke federal jurisdiction. Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004). When evaluating a facial attack, the court must accept the factual allegations in the plaintiff's complaint as true. Whisnant v. United States, 400 F.3d 1177, 1179 (9th Cir. 2005).

"By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." Safe Air for Everyone, 373 F.3d at 1039. In resolving a factual challenge, the court "need not presume the truthfulness of the plaintiff's allegations" and "may look beyond the complaint to matters of public record without having to convert the motion into one for summary judgment." White, 227 F.3d at 1242. "Where jurisdiction is intertwined with the merits, [the court] must 'assume the truth of the allegations in the complaint . . . unless controverted by undisputed facts in the record.'" Warren, 328 F.3d at 1139 (quoting Roberts v. Corrothers, 812 F.2d 1173, 1177 (9th Cir. 1987)).

**B.  Rule 12(b)(6)**

Under Rule 12(b)(6), a party may bring a motion to dismiss for failure to state a claim upon which relief can be granted. Rule 12(b)(6) must be read in conjunction with Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that a pleader is entitled to relief," in order to give the defendant "fair notice of what the claim is and the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007); see Ileto v. Glock Inc., 349 F.3d 1191, 1199-1200 (9th Cir. 2003). When evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the complaint—as well as any reasonable inferences to be drawn from them—as true and construe them in the light most favorable to the non-moving party. See Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005); ARC Ecology v. U.S. Dep't of Air Force, 411 F.3d 1092, 1096 (9th Cir. 2005); Moyo v. Gomez, 32 F.3d 1382, 1384 (9th Cir. 1994). Courts are not required, however, "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." In re Gilead Scis. Sec. Litig., 536 F.2d 1049, 1055 (9th Cir. 2008) (internal citation and quotation omitted). Courts also need not accept as true allegations that contradict facts which may be judicially noticed. See Mullis, 828 F.2d at 1388.

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief'

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citations omitted).  Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level."  Id.

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  Id. at 570; Ashcroft v. Iqbal, 556 U.S. 662 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556).  The Ninth Circuit has clarified that (1) a complaint must "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation."  Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

## C.  Motions for Reconsideration

"The Federal Rules of Civil Procedure do not provide for a 'Motion for Reconsideration' but such motions may properly be considered either a Rule 59(e) motion to alter or amend judgment or a Rule 60(b) motion for relief from judgment," Hamilton Plaintiffs v. Williams Plaintiffs, 147 F.3d 367, 371 n.10 (5th Cir. 1998), provided a judgment has been entered.  Rule 59(e) states that a "motion to alter or amend a judgment must be filed no later than 28 days after the entry of judgment."  Fed. R. Civ. P. 59(e).  Rule 60(b) provides for relief from a final judgment, order, or proceeding upon a showing of the following:

> (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).

In this district, motions for reconsideration are also governed by Central District Local Rule 7–18.  "Courts in this district have interpreted Local Rule 7-18 to be coextensive with Rules 59(e) and 60(b)."  Tawfilis v. Allergan, Inc., 2015 WL 9982762, at *1 (C.D. Cal. Dec. 14, 2015).  Local Rule 7-18 provides that a motion for reconsideration of the decision on any motion may be made only on the grounds of:

> (a) a material difference in fact or law from that presented to the
> Court before such decision that in the exercise of reasonable
> diligence could not have been known to the party moving for
> reconsideration at the time of such decision, or (b) the emergence
> of new material facts or a change of law occurring after the time of
> such decision, or (c) a manifest showing of a failure to consider
> material facts presented to the Court before such decision.  No
> motion for reconsideration shall in any manner repeat any oral or
> written argument made in support of or in opposition to the
> original motion.

L. R. 7-18.

Motions to reconsider are committed to the discretion of the trial court.  Arteaga v. Asset Acceptance, LLC, 733 F. Supp. 2d 1218, 1236 (E.D. Cal. 2010).  Reconsideration is an "extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources."  Kona Enterprises, Inc. v. Est. of Bishop, 229 F.3d 877, 890 (9th Cir. 2000) (citation omitted).  "[A] motion for reconsideration should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law."  389 Orange St. Partners v. Arnold, 179 F.3d 656, 665 (9th Cir. 1999).  "Clear error occurs when 'the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed.'"  Smith v. Clark Cnty. Sch. Dist., 727 F.3d 950, 955 (9th Cir. 2013).

A motion for reconsideration "may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation."  Carroll v. Nakatani, 342 F.3d 934, 945 (9th Cir. 2003).  In other words, it is "not the place for parties to make new arguments not raised in their original briefs."  Arteaga, 733 F. Supp. 2d at 1236.  "A motion for reconsideration should not be used to ask the court to rethink what the court had already thought through—rightly or wrongly . . . [because] [a]rguments that the court was in error on the issues it considered should generally be directed to the Court of Appeals."  United States v. Rezzonico, 32 F. Supp. 2d 1112, 1116 (D. Ariz. 1998) (internal quotations and citation omitted).  "A party seeking reconsideration must show more than a disagreement with the Court's decision, and recapitulation of the cases and arguments considered by the court before rendering its original decision fails to carry the moving party's burden."  United States v. Westlands Water Dist., 134 F. Supp. 2d 1111, 1131 (E.D. Cal. 2001) (internal quotations and citations omitted).  To prevail on a motion to reconsider, the moving party "must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision."  Arteaga, 733 F. Supp. 2d at 1236.

## D. Rule 15

Federal Rule of Civil Procedure 15 ("Rule 15") provides that leave to amend "shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  The Ninth Circuit has held that

"'[t]his policy is to be applied with extreme liberality.'" <u>Eminence Capital, L.L.C. v. Aspeon, Inc.</u>, 316 F.3d 1048, 1051 (9th Cir. 2003) (quoting <u>Owens v. Kaiser Found. Health Plan, Inc.</u>, 244 F.3d 708, 712 (9th Cir. 2001)). Generally, a "district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by allegation of other facts." <u>Lopez v. Smith</u>, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks and citation omitted). Despite this liberal standard, leave to amend may be denied if amendment would be futile to rectify the deficiencies in a pleading. <u>Leadsinger, Inc. v. BMG Music Pub.</u>, 512 F.3d 522, 532 (9th Cir. 2008).

## IV. DISCUSSION

The primary argument raised in the Motion is that Plaintiff fails to allege that reasonable consumers are likely to be deceived by the Products' packaging, which defeats her CLRA, FAL and UCL claims. (<u>See</u> Motion at 7-9.) Plaintiff responds that the law of the case doctrine bars reconsideration of this argument, for the Court rejected it in the MTD Complaint Order. (<u>See</u> Opposition at 2-5.) For the reasons discussed below, the Court finds it appropriate to revisit its earlier holding in the MTD Complaint Order. Applying the weight of binding and persuasive authority, the Court now holds that Plaintiffs' first, second and third causes of action all fail under the reasonable consumer test. The Court also finds Plaintiffs' fourth cause of action subject to dismissal. As such, it GRANTS the Motion.

## A. The Court Can Reconsider its Earlier Decision at its Discretion

In the MTD Complaint Order, decided on April 22, 2021, the Court rejected Defendant's argument that the Complaint's allegations failed the reasonable consumer test and held that the named plaintiff at the time, Mr. Rodriguez, stated a claim under the CLRA, FAL and UCL. <u>See de Dios Rodriguez v. Ole Mexican Foods Inc.</u>, 2021 WL 1731604, at *1-5 (C.D. Cal. Apr. 22, 2021). Defendant seeks dismissal of these claims in the FAC again under the reasonable consumer test, urging the Court to revisit its earlier analysis in light of <u>Moore v. Trader Joe's Co.</u>, 4 F.4th 874 (9th Cir. 2021), which was decided after the MTD Complaint Order. Although Plaintiff initially argues that the law of the case doctrine "bars reconsideration" of whether reasonable consumers are likely to be deceived, Ms. La Barbera thereafter appears to implicitly acknowledge the Court retains discretion to revisit its earlier ruling, arguing instead why it *should* not. (<u>See</u> Opposition at 2-4.)

"The law-of-the-case doctrine generally provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." <u>Askins v. U.S. Dep't of Homeland Sec.</u>, 899 F.3d 1035, 1042 (9th Cir. 2018) (citations and quotations omitted). But "[t]e law of the case doctrine *does not preclude a court from reassessing its own legal rulings in the same case.* The doctrine applies most clearly where an issue has been decided by a higher court; in that case, the lower court is precluded from reconsidering the issue and abuses its discretion in doing so except in [] limited circumstances." <u>Id.</u> at 1042 (emphasis added). Those limited circumstances are when the "1) the first decision was clearly erroneous; 2) an intervening change in the law has occurred; 3) the evidence on remand is

substantially different; 4) other changed circumstances exist; or 5) a manifest injustice would otherwise result." Id.  "A court may also decline to revisit its own rulings where the issue has been previously decided and is binding on the parties—for example, where the district court has previously entered a final decree or judgment," but "[t]he law of the case doctrine does not, however, bar a court from reconsidering its own orders before judgment is entered or the court is otherwise divested of jurisdiction over the order."  Id. (citations omitted).

Moreover, "[]nce the plaintiff elects to file an amended complaint, the new complaint is the only operative complaint before the district court." Id. at 1043.  When ruling on a motion o dismiss an amended complaint, the district court is not "bound by any law of the case."  Id. Rather, it retains discretion to "decide the second motion to dismiss in the same way it decided the first, but permitting the filing of an amended complaint requires a new determination. That leaves the district court free to correct any errors or misunderstandings without having to find that its prior decision was 'clearly erroneous.'"  Id.  While it is a "rare case where it will be an efficient use of an attorneys' time—not to mention his client's money—to raise identical arguments already rejected," O'Connor v. Uber Techs., Inc., 58 F. Supp. 3d 989, 996 n.3 (N.D. Cal. 2014), where a plaintiff files an amended complaint, superseding the original complaint and rendering it without legal effect, courts routinely permit defendants to "move to challenge the *entire* amended complaint—including those causes of action the court had previously found sufficient." Id. at 995-96 (collecting cases).  Such a motion to dismiss is thus not necessarily treated as an impermissible motion for reconsideration, although a district court is free to simply disregard arguments previously rejected and stand by its earlier ruling.  See id.

As these authorities illustrate, the law of the case doctrine does not prevent the Court from revisiting the central holding of the MTD Complaint Order.  The Court also need not treat the Motion as a motion for reconsideration.  But even if the law of the case doctrine were applicable, and even if the Court were to treat the Motion as a motion for reconsideration, the Court would exercise its discretion to amend its prior analysis and reverse its prior holding under the reasonable consumer test.  "The exceptions to the law of the case doctrine largely mirror the standard in a motion for reconsideration." Mills v. Target Corp., 2021 WL 4893352, at *4 (C.D. Cal. July 29, 2021), aff'd, 2023 WL 2363959 (9th Cir. Mar. 6, 2023).  In each, a court retains discretion to depart from a previous ruling when an intervening change in the law has occurred. See L.R. 7-18; United States v. Alexander, 106 F.3d 874, 876 (9th Cir. 1997).  As discussed below, Moore, 4 F.4th 874, provides sufficient justification to reconsider the Court's earlier ruling.  The Court need not decide whether the MTD Complaint Order was "clearly erroneous" at the time, but based on the current state of the law, the Court now finds the conclusion reached in the MTD Complaint Order untenable.

## B.  Reasonable Consumer Test

Defendant renews its argument that Plaintiff fails to state a claim under the FAL, CLRA and UCL because her allegations fail the "reasonable consumer" test.  (See Motion at 1.)

Plaintiff brings claims under three California consumer protection statutes—the UCL, FAL, and CLRA—that cover "interrelated harms." See Fisher v. Monster Beverage Corp., 656 F. App'x 819, 822 (9th Cir. 2016). These California laws "prohibit not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." Moore v. Mars Petcare US, Inc., 966 F.3d 1007, 1017 (9th Cir. 2020) (internal quotations, brackets and citations omitted). "A complaint is sufficient with regard to all three statutes when it alleges that (i) a representation was made, (ii) it was false or likely to mislead a reasonable consumer, (iii) the plaintiff saw **and** relied on the representations for their truth in purchasing the item, and (iv) the plaintiff would not have bought the item otherwise." Fisher, 656 F. App'x at 822. To state a claim under the UCL, FAL, or CLRA, a plaintiff must allege the defendant's purported misrepresentations are likely to deceive a reasonable consumer. See Williams v. Gerber Products Co., 552 F.3d 934, 938 (9th Cir. 2008) (explaining that unless the advertisement at issue targets a particularly vulnerable group, courts must evaluate claims for false or misleading advertising from the perspective of a reasonable consumer); Davis v. HSBC Bank Nevada, N.A., 691 F.3d 1152, 1161 (9th Cir. 2012) ("Whether an advertisement is 'misleading' must be judged by the effect it would have on a reasonable consumer."); Reid v. Johnson & Johnson, 780 F.3d 952, 958 (9th Cir. 2015) ("It is true that violations of the UCL, FAL, and CLRA are evaluated from the vantage point of a 'reasonable consumer.'"); Kim v. Benihana, Inc., 2021 WL 1593248, at *3 (C.D. Cal. Feb. 24, 2021) ("Claims brought pursuant to the UCL, FAL, and CLRA are 'governed by the reasonable consumer test.'") (citation and internal quotations omitted).

The reasonable consumer standard requires "more than a mere possibility that [Defendant's] label 'might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner.'" Ebner v. Fresh, Inc., 838 F.3d 958, 965 (9th Cir. 2016) (quoting Lavie v. Procter & Gamble Co., 105 Cal. App. 4th 496, 508 (2003)). Rather, plaintiffs must plausibly allege "a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." Id. Put another way, "[a] representation does not become 'false and deceptive' merely because it will be unreasonably misunderstood by an insignificant and unrepresentative segment of the class of persons to whom the representation is addressed." Lavie, 105 Cal. App. 4th at 507 (citation omitted). Generally, a plaintiff's "selective interpretation of individual words or phrases from a product's labeling cannot support a CLRA, FAL, or UCL claim." Hairston v. S. Beach Beverage Co., 2012 WL 1893818, at *4 (C.D. Cal. May 18, 2012). To the contrary, courts look to the "promotion as a whole" to determine if a product's advertising is deceptive. See Freeman v. Time, Inc., 68 F.3d 285, 290 (9th Cir. 1995). "A plaintiff's own 'unreasonable assumptions' about a product's label or desire to take the label out of 'its proper context' will not suffice." Corpuz v. Bayer Corp., 2023 WL 2292579, at *4 (S.D. Cal. Feb. 28, 2023) (quoting Becerra v. Dr. Pepper/Seven Up., Inc., 945 F.3d 1225, 1229–30 (9th Cir. 2019)).

At the motion to dismiss stage, a court can dismiss a complaint for failure to state a claim only where it can conclude as a matter of law that members of the public are not likely to be deceived by the advertisement. Mars Petcare, 966 F.3d at 1017. Whether an advertisement is deceptive will usually be a question of fact not appropriate for decision on a motion to dismiss.

See id.; Williams, 552 F.3d at 938. Nonetheless, the "primary evidence in a false advertising case is the advertising itself," Brockley v. Moore, 107 Cal. App. 4th 86, 100 (2003), while "courts regularly review product packaging during a motion to dismiss." Sinatro v. Mrs. Gooch's Nat. Food Markets, Inc., 2023 WL 2324291, at *11 (N.D. Cal. Feb. 16, 2023). "[W]here plaintiffs base deceptive advertising claims on unreasonable or fanciful interpretations of labels or other advertising, dismissal on the pleadings may well be justified." Moore, 4 F.4th at 882–83 (citation omitted). Moreover, "a 'rational consumer' would not 'simply assume' something about a product that they can 'plainly see.'" Sinatro, 2023 WL 2324291, at *10 (quoting Ebner, 838 F.3d at 966). As such, it is appropriate to dismiss an action at the pleading stage for failure to state a claim when "it [is] not necessary to evaluate additional evidence regarding whether the advertising [is] deceptive, since the advertisement itself [makes] it impossible for the plaintiff to prove that a reasonable consumer was likely to be deceived." Williams, 552 F.3d at 939; see also Ebner, 838 F.3d at 966-68 (finding that the plaintiff "has not alleged, and cannot allege, facts to state a plausible claim that the Sugar label is false, deceptive, or misleading" and upholding dismissal of claims without leave to amend); Davis, 691 F.3d at 1162 (upholding dismissal where plaintiff's theory "defies common sense" and the advertising "was not likely to deceive a reasonable consumer). "Thus, where a [c]ourt can conclude as a matter of law that members of the public are not likely to be deceived by the product packaging, dismissal is appropriate." Hairston, 2012 WL 1893818, at *4.

Defendant asserts that the "expectations for the reasonable consumer set forth in [Moore, 4. 4th 874] are markedly higher than the expectations previously identified for the reasonable consumer[.]" (Motion at 1.) Though Moore reaffirmed earlier Ninth Circuit precedent in many ways, the Court agrees that it materially altered the state of the law with regard to the central issue in this case: under what circumstances packaging *as a whole* can mislead consumers when there is an arguably ambiguous representation on the front label. In Moore, the plaintiffs challenged the Trader Joe's store brand Manuka honey product, which is marketed as "100% New Zealand Manuka Honey" or "New Zealand Manuka Honey" on the front label. 4. F. 4th at 876-88. The plaintiffs, noting that the Trader Joe's Manuka Honey products actually consisted of only 57.3% to 62.6% honey derived from Manuka flower nectar, argued that the labeling was likely to deceive reasonable consumers. Id. at 876. Trader Joe's countered that its labeling complied with applicable Food and Drug Administration ("FDA") guidelines, which permits labeling honey by its "chief floral source." Id. at 876-77. Moreover, as the FDA guidelines acknowledge, "busy bees cannot be prevented from foraging on different types of flowers, despite their keepers' best efforts," and therefore "it is impossible for bees to produce honey that is 100% derived from the Manuka flower." Id. at 877. Trader Joe's moved to dismiss, "arguing its Manuka Honey label is accurate, *i.e.,* its product is 100% honey whose chief floral source is Manuka, and that no reasonable consumer would believe that it was marketing a product that is impossible to create." Id. The district court agreed and dismissed the complaint without leave to amend. Id. The Ninth Circuit affirmed, holding as a matter of law that "Trader Joe's Manuka Honey labeling would not mislead a reasonable consumer." Id.

As an initial matter, the Ninth Circuit found that the products' labeling was accurate under the FDA guidelines, because "there is no dispute that all of the honey involved is

technically manuka honey, albeit with varying pollen counts." Id. at 881.  But "even though
Trader Joe's front label is accurate under the FDA's guidelines," the plaintiffs asserted that
"'100% New Zealand Manuka Honey' could nonetheless mislead consumers into thinking that
the honey was '100%' derived from Manuka flower nectar." Id.  After restating the basic
principles of the reasonable consumer test, the Ninth Circuit—for the first time, to this Court's
knowledge— stated that "[t]his is not a negligible burden" for a plaintiff to surpass. Id. at 882.

    The next steps in Moore's analysis are most critical here.  The Ninth Circuit agreed with
the district court that "there is some ambiguity as to what '100%' means in the phrase, '100%
New Zealand Manuka Honey.'" Id.  "In that context, 100% could be a claim that the product
was 100% Manuka honey, that its contents were 100% derived from the Manuka flower, or even
that 100% of the honey was from New Zealand." Id.  The Ninth Circuit adopted "the general
principle that deceptive advertising claims should take into account all the information available
to consumers and the context in which that information is provided and used." Id. (citing Bell v.
Publix Super Markets Inc., 982 F.3d 468 (7th Cir. 2020)).  It then found, like the district court,
that "as a matter of law, other available information about Trader Joe's Manuka Honey would
quickly dissuade a reasonable consumer from the belief that Trader Joe's Manuka Honey was
derived from 100% Manuka flower nectar." Id.  For one, "reasonable consumers would
necessarily require more information before they could reasonably conclude Trader Joe's label
promised a honey that was 100% derived from a single, floral source." Id.  It then rejected the
plaintiffs' argument that the ingredient label listing "Manuka Honey" as the only ingredient
reinforced the deception created by the front label, for "information available to a consumer is
not limited to the physical label and may involve contextual inferences regarding the product
itself and its packaging." Id.  The Ninth Circuit then carefully delimited the Seventh Circuit's
observation that "[d]eceptive advertisements often intentionally use ambiguity to mislead
consumers while maintaining some level of deniability about the intended meaning," id. at 883
(quoting Bell, 982 F.3d at 477), for there is a "threshold distinction" between a product like
Trader Joe's Manuka Honey and the product at issue in Bell, an 100% Grated Parmesan Cheese
product. Id.  The panel thought that "[t]he Seventh Circuit in Bell was justifiably concerned
about the possible confusion created by manufacturers who claim (in an arguably ambiguous
fashion) that the product is 100% cheese, despite their knowledge of the fact that they had added
non-cheese ingredients to produce the product, and who then try to retain some 'level of
deniability' by clarifying the front-label claim with back-label disclosures." Id. (citation omitted).
But that kind of misleading conduct was not present in Moore, for the manufacturer had not
inserted non-honey ingredients or diluted the honey, rendering moot the "potential confusion
justifying the Seventh Circuit's concern[.]" Id.

    Moreover, the Ninth Circuit found that "a reasonable consumer would be quickly
dissuaded from Plaintiffs' 'unreasonable or fanciful' interpretation of '100% New Zealand
Manuka Honey' based on three key contextual inferences from the product itself: (1) the
impossibility of making a honey that is 100% derived from one floral source, (2) the low price of
Trader Joe's Manuka Honey, and (3) the presence of the '10+' on the label, all of which is readily
available to anyone browsing the aisles of Trader Joe's." Id.  Perhaps the panel's most surprising
holding was the following: "given the foraging nature of bees, a reasonable honey consumer

would know that it is impossible to produce honey that is derived exclusively from a single floral source." Id.  As such, it found the plaintiff's interpretation of the label as fanciful as those "who claimed that the colorful cereals advertised on certain boxes of 'Froot Loops' and 'Cap'n Crunch' promised real fruit content, which courts in this circuit properly rejected outright." Id. (citations omitted).  As such, "a reasonable consumer would not understand Trader Joe's label here as promising something that is impossible to find." Id.  The Moore panel reasoned that "an average consumer of Manuka honey would likely know more than most about the production of the product," but "[r]egardless, given the sheer implausibility of Plaintiffs' alleged interpretation, a consumer of any level of sophistication could not reasonably interpret Trader Joe's label as Plaintiffs assert." Id. at 884.  The panel next found that the products' inexpensive price would put a reasonable consumer on notice that the concentration of Manuka flower nectar was relatively low. See id.  Third, the label included a sticker saying "'10+,' which represents the honey's rating on the UMF scale." Id.  Even though there were "no other details on the jar about what '10+' means," the panel reasoned that "the presence of the label puts a reasonable consumer on notice that it must represent *something* about the product." Id. (emphasis in original).  "Thus, even a consumer with cursory knowledge of the UMF scale would know Trader Joe's Manuka Honey was decidedly on the lower end of the 'purity' scale." Id. at 885.

There is only one way to apply Moore to the instant case: if the Ninth Circuit thought the plaintiffs' reading of the Trader Joe's product so implausible that it could be dismissed as a matter of law, it would surely hold the same here, for Plaintiff's interpretation of the Products is even less reasonable than the Moore plaintiffs' theory of liability.  Moore imagines a "reasonable consumer" who is intelligent, someone capable of analyzing different pieces of information, engaging in logical reasoning, and drawing "contextual inferences" from a product and its packaging.  Moore, 4 F. 4th at 882.  She is diligent, for she does not just view one phrase or image in isolation, but looks at the entirety of the packaging together—she "take[s] into account all the information available" to her and the "context in which that information is provided and used." Id. (citation omitted).  And she appears to exhibit some skepticism about the representations made to her by a product's advertising, aware that corporations attempting to sell items are conveying information to a given end and in a certain light.  She does not expect advertisers to lie to her, nor should any consumer be expected to endure affirmative misrepresentations or strongly misleading claims.  But she understands nuance and context, and that when making her purchasing decisions, all representations made by a seller are designed to *sell*.  See Maeda v. Kennedy Endeavors, Inc., 407 F. Supp. 3d 953, 970 (D. Haw. 2019) ("The reasonable consumer test does not contemplate a particularly naïve consumer" or the "least sophisticated consumer," "[n]or do we test the impact on the unwary consumer") (quotations and citation omitted).

Central to Moore's explicit and implicit analysis are two additional premises: (1) that reasonable consumers in the market for a given product generally know a little bit about that product, at least more than a random person on the street, who may have no interest in that product or given it any thought; and (2) if a consumer cares about any particular quality in a product, she is willing to spend at least a few seconds reading a product's packaging to see if it answers her question.  For the Ninth Circuit, the reasonable consumer in the market for honey, particularly Manuka honey, is not just the amalgamated average American—she is a "reasonable

*honey* consumer," who has thought even a little bit about the "foraging nature of bees" and therefore "know that it is impossible to produce honey that is derived exclusively from a single floral source." Moore, 4 F. 4th at 883. She need not be an "expert in honey production or beekeeping," but she is chargeable with notice that "it is impossible to exercise complete control over where bees forage down to each specific flower or plant." Id. As further explained below, the "reasonable tortilla consumer" knows a thing or two about tortillas, including a cursory understanding of their history and cross-border appeal, and has a basic grasp of broader social phenomena, such as the significant presence of Mexican American or Latino immigrants in the United States and the foods they have introduced into the mainstream American market.

Next, the Ninth Circuit also suggests that reasonable consumers who care about a facet of a product—who, say, "attach importance to . . . a higher purity level" of honey derived from Manuka flower nectar, id. at 884, will invest at least a few seconds into reading the front and back labels of a product to see if it answers their question. She will likely start by looking at the front of the package, and unless the front label is unmistakably clear about the issue for which she seeks an answer, she knows that she would "necessarily require more information before [she] could reasonably conclude" what the answer is. Id. at 882. So what does she do? She would look at the "product itself" for answers, including "key contextual inferences[.]" Id. at 883. Of course, the legal fiction of the reasonable consumer should account for the fact that different consumers care about different things. Take, for example, the reasonable tortilla consumer. Price-conscious tortilla consumers will look for the cheapest option available, which means they will compare the total or per-unit price of each product. Some calorie-conscious tortilla consumers might hunt for what they perceive to be the healthiest tortillas on the market; on balance, they might prefer corn tortillas to flour, and compare items based on their fat content, whether certain oils or other ingredients are used, and so forth, which means they will look at the ingredient list. Others may only wish to buy organic tortillas and will make sure their preferred brand contains the requisite certification. And some, perhaps, are looking for tortillas made in Mexico. (See FAC ¶ 4) ("Consumers value tortillas that are authentically made in Mexico"). The point is that tortilla consumers may care about different things, but *if* they care about a given quality in a tortilla product, they are willing to spend a few seconds investigating that aspect of it by at least engaging in a cursory reading of the packaging. The Court must draw on its "judicial experience and common sense" when applying the reasonable consumer test at the pleadings stage. Ebner, 838 F.3d at 963. In doing so, it finds that any reasonable tortilla consumer who cares even a little bit about whether the tortillas she is buying in a grocery store are made in a Mexican factory rather than an American one, is willing to spend five seconds reading a product's packaging to find out.[1]

The bottom line is this: under Moore, 4 F.4th 874, the reasonable consumer does not approach purchasing decisions with a professorial genius or inclination toward exhaustive

---

[1] None of this is to suggest that a reasonable consumer must engage in thorough research of a product, such as venturing onto a company's website or comparing reviews online. The critical piece of information relevant to this case is clearly stated on the back of the Products. The Court holds that reasonable consumers will spend five seconds looking at the front and back labels. It does not suggest that consumers must do anything more than that to be "reasonable."

research, but she is also not a chump, too doltish or careless to engage in the following simple analysis: (1) I care about whether my tortillas are made in Mexico; (2) The front of the Products' packaging does not say one way or the other; (3) I will check the back as well, which is a useful place to look because geographic origin information is often on the back of packaging; (4) The Products all say "Made in U.S.A." and "manufactured by" a company located in "Norcross, GA" in average or large-sized print; (5) The Products are not made in Mexico. Only "some few consumers viewing [the Products' labels] in an unreasonable manner" will fail to engage in this cursory analysis. Ebner, 838 F.3d at 965.

Before turning to further relevant district court authority and the specific representations made on the Products, the Court notes why Moore, 4 F.4th 874 provides an important clarification of the reach of Williams, 552 F.3d 934, upon which Plaintiff relies. In Williams, the plaintiffs (parents of toddlers) alleged that Fruit Juice Snacks (a product for toddlers) were packaged deceptively because the two primary ingredients were sugar and corn syrup and the only fruit or juice content was white grape juice from concentrate, while the product was named Fruit Juice Snacks, had images of (non-grape) fruits on the box, stated it contained "fruit juice and other natural ingredients" and was "specifically designed to help toddlers grow up strong and healthy." See id. at 936-39. The Ninth Circuit held that a reasonable consumer could be misled into believing that the product contained the fruits pictured on the front and all the ingredients were natural, when that was false; its oft-cited holdings are that an ingredient list cannot be used as a "shield for liability for the deception" and that a reasonable consumer is not "expected to look beyond misleading misrepresentations on the front of the box to discover the truth from the ingredient list in small print on the side of the box." Id. at 939. The central problem in Williams was that "the packaging showed whole fruits that were not included in the product in any amount." Kennard v. Kellogg Sales Co., 2022 WL 4241659, at *4 (N.D. Cal. Sept. 14, 2022). At a higher level of generality, "[s]tated straightforwardly, Williams stands for the proposition that if the defendant commits an act of deception, the presence of fine print revealing the truth is insufficient to dispel that deception." Ebner, 838 F.3d at 966. By contrast, the Ninth Circuit found in Ebner that, "unlike in Williams, there is no deceptive act to be dispelled" because the "weight label does not contradict other representations or inferences on [the] packaging." Id. Similarly, in Freeman, 68 F.3d 285, the Ninth Circuit found that qualifying language located within a promotion itself was sufficient to dispel any possible misconception. There, the defendant sent the plaintiff a sweepstakes promotion that said, among other things, "If you return the grand prize winning number, we'll officially announce that MICHAEL FREEMAN HAS WON $1,666,675.00 AND PAYMENT IS SCHEDULED TO BEGIN." Id. at 287. The plaintiff argued that reasonable consumers would be deceived by the promotion because a "reader will review the large print and ignore the qualifying language in small print," thus believing they had already won the sweepstakes. Id. at 289. The Ninth Circuit rejected the argument:

> The promotions expressly and repeatedly state the conditions
> which must be met in order to win. None of the qualifying
> language is hidden or unreadably small. The qualifying language
> appears immediately next to the representations it qualifies and no

> reasonable reader could ignore it.  Any persons who thought that
> they had won the sweepstakes would be put on notice that this was
> not guaranteed simply by doing sufficient reading to comply with
> the instructions for entering the sweepstakes.

Id. at 289-90.  As a recent district court opinion helpfully explains, Moore establishes a middle ground between Ebner or Freeman and Williams, while courts should view these cases along a spectrum:

> In sum, the analysis of [California consumer protection] claims
> proceeds along a spectrum.  On one end, plainly fanciful or
> unreasonable interpretations of a product's labeling are subject to
> dismissal.  See Freeman, 68 F.3d at 290.  On the other end, false or
> ambiguous front-label claims cannot be cured by contradicting
> back-label statements as a matter of law.  See Williams, 552 F.3d at
> 939.  Between these poles, ambiguous front-label claims that are
> consistent with back-label claims permit courts greater latitude to
> consider the surrounding context of the product and packaging to
> determine if the claims are misleading.  See Moore, 4 F.4th at 883.

Meza v. Coty, Inc., 2023 WL 3082346, at *9 (N.D. Cal. Apr. 24, 2023).  Based on the analysis above and below, the Court finds that Plaintiff's reading of the Products' labels are likely in the first category of plainly unreasonable interpretations.  But even if it is not, the Products are at worst in the Moore category of "ambiguous front-label claims that are consistent with back-label claims," in which all available context definitively shows that the Products are not made in Mexico.  Meza, 2023 WL 3082346, at *9; cf. Kennard, 2022 WL 4241659, at *5 ("Finally, assuming that the use of the term VEGGIE is ambiguous, any ambiguity is dispelled by the packaging, which describes the products as free of meat and contains photos of products that do not obviously contain vegetables or represent that they contain any plant-based ingredient in particular.").  Either way, this case is not like Williams, for there are certainly no falsehoods on the front of the labels, while the back labels have nothing to contradict or correct.  See Gudgel v. Clorox Co., 514 F. Supp. 3d 1177, 1187 (N.D. Cal. 2021) ("The court concludes that there is no affirmative misrepresentation or deception on the product's label.  Without a deceptive act or statement, Williams does not apply.").

Plaintiff claims the following representations would lead a consumer to believe the Products are made in Mexico: (1) one of the Products, La Banderita Sabrosísimas Flour, states "El Sabor de Mexico!" on the front, which translates to the flavor or taste of Mexico; (2) the three remaining Products state "The Taste of Mexico!" on the front; (3) one of the products is called Sabrosísimas Tortillas Caseras ("tasty homemade tortillas"); (4) one of the Products is called Sabrosísimas Corn Tortillas; (5) Defendant's brand name is "La Banderita" ("the flag"), while each of the Products contains an image of a Mexican flag; and (6) some of the Products state they are "Authentic" within a circular Mexican flag logo.  (See FAC ¶¶ 16-17.)  The Court finds that many of Plaintiff's allegations are misleading or omit the material context in which

certain representations appear; because the Court takes judicial notice of the images of the Products' packaging, it bases its analysis on the actual contents of the packaging, rather than Plaintiff's selective representation of them.  The Court makes the following observations about each of the individual Products:

1. **La Banderita Sabrosísimas Corn**



Apart from the brand name "La Banderita" and the word "Sabrosísimas," every single other word (apart from "tortillas" itself) on the front and the back of the packaging is in English, not Spanish.  For instance, the front label refers to "corn tortillas" and "Quality Corn Premium" in English, while the back label provides heating instructions, an ingredient list, directions to Defendant's website, telephone number and email address in English as well.  While Plaintiff claims there is a "Mexican flag on the front and center of the packaging" (FAC ¶ 15), that is false, or at least misleading.  There is an image of the vertical tricolor of green, white and red, but Defendant has erased the national coat of arms (an eagle perched on a cactus with a rattlesnake in its mouth) from the center white stripe and replaced it with an image of corn.

//
//
//
//
//
//
//
//

**CIVIL MINUTES—GENERAL**  Initials of Deputy Clerk mg

### 2. La Banderita Sabrosísimas Flour

 

Although this Product contains the most Spanish-language representations, *e.g.*, Sabrosísimas Tortillas Caseras and El Sabor de Mexico, English words and phrases still predominate over Spanish words and phrases.  On the front label, the Product states it has "Excellent Taste Premium"[2] and is Tasty & Fluffier[3], contains "10 Flour Tortillas," can be used as a "Soft Taco," is made with unbleached flour, no hydrogenated oils, no cholesterol, 0g trans fat, and no lard.  Even the Spanish phrases are translated, for the bottom of the front label states in large print under "Sabrosísimas" that these are "Homestyle Flour Tortillas."  The front label does not literally contain a Mexican flag, for the national coat of arms has once again been replaced with an image, this time of wheat (as these are flour, not corn, tortillas).  The back label is similar to that described above, with the notable addition of "filling steps" written in English that explains to the tortilla consumer how to fill a tortilla with their "favorite toppings" and then fold and roll the tortilla.  While the other Products state on the back that they are "Made in U.S.A." in bold, large print, this Product goes a step further, making that representation in a circle surrounding an American flag, that also says "Hecho En Los E.U.A.," for Estados Unidos de América, an alternative form of the standard Spanish-language abbreviation, EE. UU.

//
//
//
//
//

---

[2] This is meaningless advertising jargon.

[3] Than *what*, the Product does not say, but presumably than comparable brands or an earlier recipe.

### 3.  La Banderita Burrito Grande



This Product has hardly any Spanish-language representations on the front label, apart from the brand name "La Banderita" and "Burrito Grande," the latter of which hardly counts as Spanish because it would be recognizable to even monolingual English-speaking Americans. Even for those who do not know what "Burrito Grande" means, the front label explains directly below it that these are "Extra Large Flour Tortillas."  It states "A Taste of Mexico!" in English and makes the same or similar English representations as those described above, *e.g.*, "Authentic Taste Premium," made with unbleached flour, etc.  The front label contains the same flag image as that of the La Banderita Sabrosísimas Flour product, with wheat superimposed on the Mexican tricolor.  On the back label, a circle containing "La Banderita Authentic Tortillas" surrounds a Mexican flag with the coat of arms not visible, as an image of a bull is superimposed. The back label is virtually identical to those described above.

//
//
//
//
//
//
//
//
//
//
//
//
//
//

### 4. La Banderita Whole Wheat Fajita



Apart from La Banderita and Fajita (which, as noted below, is a word of recent and "Tex-Mex," not Mexican, origin), the entire front label is in English. It states that these are "100% Whole Wheat Flour Tortillas" and has the same nutritional features noted above. Like the flour tortilla Products above, the Mexican flag here features wheat in lieu of the coat of arms. The back label is substantively identical to those described above.

Taking the salient features of the Products together, none of these representations in isolation or as a whole would mislead a reasonable consumer into believing the Products are made in Mexico. As noted above and below, the reasonable tortilla consumer would know some basic geography, history, economics and sociology as it relates to Mexican food. Cf. Moore, 4 F. 4th at 883. She would know that the United States of America is a nation of immigrants. She has a basic understanding that there is such a thing as global capitalism, in which markets for goods and services operate across borders. She would know that foods associated with other cultures, from Chinese to Italian to Mexican, have become enormously popular in the United States, with Americans of all kinds enjoying these cuisines, or Americanized versions of them, at restaurants and at home. Because these foods are commonplace in the United States, not just in their countries of origin, she understands that there are American businesses, or multinational businesses, that sell these kinds of foods—i.e., it is an inherently unreasonable assumption that just because a food clearly originates from a foreign country, whether it is pasta or tortillas, that *ipso facto* it must be made in that country. This is obviously true of ethnic restaurants, which by definition serve food originating from foreign nations but made in the United States. But it is also true of manufactured products, including the kind of products produced by the kinds of businesses like Defendant's: an American company manufacturing and selling goods in the United States, founded and led by a family with an immigrant background who make foods

originating from their family's nation of origin.  See *The Olé Story*, Olé Mexican Foods, https://olemex.com/our-story/ (Defendant's "founder, Veronica Moreno, began making and selling authentic tortillas in Atlanta, Georgia, in 1988.  She used traditional ingredients and techniques passed down to her through generations from her native Mexico").

        A reasonable consumer will also not be misled by the presence of some foreign language words or phrases on the Products.  See Eshelby v. L'Oreal USA, Inc., 2023 WL 2647958, at \*4 (S.D.N.Y. Mar. 27, 2023) (applying reasonable consumer test under California law and holding that "t[]he mere presence of words in a foreign language is insufficient to mislead a reasonable consumer."). Virtually all of the words on the Products' labels are in English, not Spanish, and even most of the Spanish words or phrases are translated into English.  As such, even if the Court were to accept Plaintiff's reasoning that Spanish words can contribute to the impression that the Products are manufactured in Mexico, the actual inference that can be drawn from the Products' packaging as a whole is rather weak.  Cf. Romero v. Tropicale Foods, LLC, 2021 WL 6751908, at \*5 (C.D. Cal. Dec. 22, 2021) (Bernal, J.) ("The products here . . . are rather scant in Spanish phrases that would mislead a reasonable consumer.  Instead, the vast majority of the "phrases" are translations rather than Spanish idioms or some other type of phrase that may mislead a consumer about the products origin, such as 'A Taste of Mexico' or 'Authentic Mexican Ice Cream.'  . . . Thus, by Plaintiffs' reasoning, if 'Spanish phrases' are sufficient to make a claim that a products' packaging misleads reasonable consumers about its origin, it is far less likely to be the case when (1) the phrases are translations and (2) affirmative representations are only in English.")  The Court assumes without deciding that a package entirely written in Spanish might convey to a consumer that its primary market is Spanish speaking, such as the Mexican market; the consumer assumes it is being sold in the United States through some importation or distribution agreement.  And a reasonable consumer could infer that products targeting the Mexican market are more likely to be made in Mexico.  But no reasonable consumer would look at the Products and think they must target a monolingual Spanish speaking market, because the Products are clearly designed to be understood by English, not Spanish, speakers: English, not Spanish, predominates on the packaging, while there is nothing on the packaging in either language that references Mexico in connection with a place of manufacture.  Cf. Culver v. Unilever United States, Inc., 2021 WL 2943937, at \*8 (C.D. Cal. June 14, 2021), appeal dismissed, 2021 WL 6424469 (9th Cir. Dec. 29, 2021) ("While the front labels contain two words in the French language – which are prepositions (i.e. 'depuis' and 'que') – and two proper nouns (i.e. 'Paris' and 'Maille'), there are no concomitant words or references to a geographic source or origin.  For example, there are no phrases such as 'from Paris (i.e. 'de Paris'), 'product of France,' or even 'imported.'  All of the remaining words on the front label are in English. Likewise, the translation of the French words into English does not suggest the place of manufacture. 'Depuis 1747' means 'since 1747' and 'que Maille' means 'that (or than) Maille.' Thus, the pleadings do not delineate a basis, other than unfounded supposition, for a consumer to believe that the Products were made in France."); Eshelby, 2023 WL 2647958, at \*4 ("[N]one of the text on the labels, either in English or in French, make any representation as to the country of manufacture, save for the English disclosures on the back of each label correctly stating the country where the product is made.").

Next, none of the written representations on the Products are inherently false or misleading. Phrases like "The Taste of Mexico!" are at once *true* in every meaningful sense and meaningless; the point is that they are different in kind from stating the Products are *from* Mexico. The phrase is true because tortillas *are* Mexican. It is also meaningless because it is somewhat nonsensical to say that anything tastes like a country. To say that tortillas taste like Mexico is not misleading, for foods eaten or made in the United States can "taste of Mexico," just as one could eat a hamburger or any quintessentially "American" food outside the United States and say that it "tastes of America." Cf. Dumas v. Diageo PLC, 2016 WL 1367511, at *4 (S.D. Cal. Apr. 6, 2016) ("As for 'The Taste of Jamaica,' it seems that Plaintiffs take the phrase quite literally and contend that the beer would have the taste of Jamaica if the ingredients actually came from Jamaica. However, 'The Taste of Jamaica' is a vague and meaningless phrase – who can say what Jamaica 'tastes' like? When viewed together with the phrase 'Jamaican Style Lager,' a reasonable interpretation of the phrase is that the beer is made in a way that people identify with Jamaica (either a particular process and/or a certain recipe) and evokes the spirit or feeling of Jamaica."); Broomfield v. Craft Brew All., Inc., 2017 WL 3838453, at *6 (N.D. Cal. Sept. 1, 2017), on reconsideration in part, 2017 WL 5665654 (N.D. Cal. Nov. 27, 2017) (finding that the phrase "Liquid Aloha" on Kona beer is "akin to the slogan 'The Taste of Jamaica' on the packaging for Red Stripe" and that "merely referencing Hawaii and its culture on the packaging is not enough on its own to confuse a reasonable consumer regarding the origin of the beer"). Only an insignificant number of unreasonable people viewing such representations in an unreasonable manner would think that "The Taste of Mexico!" must mean "Made in Mexico." See Kim v. Blue Triton Brands, 2022 WL 17061085, at *4 (C.D. Cal. Nov. 1, 2022) ("Mere references to a geographic location on the front of the packaging are not sufficient to mislead a reasonable consumer."); Ebner, 838 F.3d at 965; Lavie, 105 Cal. App. 4th at 508.

Images, logos and graphics can convey a strong message to consumers, and often they can be more powerful than words alone. A flag is obviously a powerful symbol of a national identity. But not all flag likenesses evoke the same effect. If the Products contained an actual Mexican flag, especially one paired with any kind of statement of a seemingly "official" nature, perhaps a consumer could think the Products display some kind of governmental imprimatur of Mexican origin. A product that bears the Mexican flag and says "Made in Mexico" or "Hecho en Mexico" beneath it is obviously misleading if, in fact, the product is made in the United States. So, too, may be a product bearing a Mexican flag with the words "Official Product" or "100% Mexican" or another phrase that suggests a representation regarding the product's supply chain, rather than just a cultural affiliation. But no reasonable consumer would think the Mexican flag imagery on the Products suggests that they must be *made* in Mexico, for these are highly stylized "flags," decidedly unofficial in nature: they adopt the Mexican tricolor, with images of wheat or corn in lieu of the national coat of arms. Such imagery evokes Mexican heritage, which is truthful, rather than misleading: tortillas originate from Mexico. It does not purport to convey the products are Mexican in an official sense, having been produced there. Cf. Maeda, 407 F. Supp. 3d at 972 (finding that use of the word "Hawaiian" and images associated with Hawaii on snack bags would not mislead reasonable consumers because there is no "specific geographic indicia related to Hawaii—such as a map, invitation to visit Defendant on the island, or Hawaiian address or geographic emblem—that indicate a 'specific place that the Product is produced and

that the consumer can visit'" and thus "Defendant's packaging—which only contains the word 'HAWAIIAN' and Hawai'i-related imagery—would not likely deceive a significant portion of the general public into believing that the Hawaiian Snacks are manufactured in Hawai'I") (internal quotations and citations omitted). Once again, the only written representation concerning the nation of manufacture of the Products clearly states that they are made in the United States, remedying any possible confusion from other images or statements. See Nelson v. MillerCoors, LLC, 246 F. Supp. 3d 666, 674 (E.D.N.Y. 2017) ("The idea that consumers purchase products based on certain of a label's statements or images (e.g., pictures of a constellation and a kangaroo) but are blind to others (e.g., a statement in plain English of where Foster's Beer is brewed) in close proximity on that label strains credibility."); Bowring v. Sapporo U.S.A., Inc., 234 F. Supp. 3d 386, 391–92 (E.D.N.Y. 2017) (holding that Sapporo beer products made in Canada would not mislead reasonable consumers into believing they were made in Japan, for "[t]he use of a trademarked star symbol and allusion to the company's historic roots in Japan are eclipsed by the accurate disclosure statement. Unlike the cases cited by Plaintiff, the disclosure statement on Sapporo appears in contrasting, visible font, and states in clear language where the product is produced.").

There are other "key contextual inferences from the product itself," Moore, 4 F.4th at 883, that a reasonable consumer will draw from at least two of the Products. A reasonable tortilla consumer viewing the La Banderita Whole Wheat Fajita product will observe that it is advertised as (1) a "fajita" and (2) 100% whole wheat. Reasonable tortilla consumers need not be experts in Mexican American history or cuisine to know that fajitas are not primarily of *Mexican* origin, but rather are a "Tex-Mex," or Texan-Mexican American or Tejano phenomenon. See JOHN AYTO, THE DINER'S DICTIONARY: WORD ORIGINS OF FOOD AND DRINK 130 (2012). Cf. Moore, 4 F. 4th at 883 ("Although a reasonable consumer might not be an expert in honey production or beekeeping, consumers would generally know that it is impossible to exercise complete control over where bees forage down to each specific flower or plant."). Moreover, fajitas have limited historical or cultural import traceable to Mexico, for the word "fajita" first appeared in print only in 1971, while fajitas were sold commercially for the first time (in Texas) in 1969. See *Fajita*, THE OXFORD ENGLISH DICTIONARY (3d. ed. 2004); Virginia B. Wood, *Fajita History*, THE AUSTIN CHRONICLE (Mar. 4, 2005), https://www.austinchronicle.com/food/2005-03-04/261130/. Whole wheat tortillas are also not particularly common in Mexico, whereas whole wheat products are particularly popular in the United States. As for the La Banderita Burrito Grande product, reasonable tortilla consumers will also understand that "burritos" enjoy only limited popularity in parts of northern Mexico, whereas they are a central part of *Mexican American* cuisine. See PAULA E. MORTON, TORTILLAS: A CULTURAL HISTORY 117 (explaining origins of the "burrito" at the U.S.-Mexico border in the 1940s in Ciudad Juarez and its trajectory since, in which "the burrito had migrated away from the Mexico and Southwest border and was on its way to become as much a part of the American food culture as the hamburger"). A reasonable consumer would not understand these Products to be necessarily made in Mexico when their historical origins, and cultural affiliations, are at least equally rooted in the United States.

The Court's above analysis is consistent with the weight of relevant district court authority, and virtually all authority the Court is aware of since the Ninth Circuit decided Moore,

4. F. 4th 874. Indeed, despite the warning in <u>Williams</u>, 552 F.3d 934 that consumer deception cases should rarely be dismissed at the pleadings stage, "there has been an ever-increasing number of cases (even within the Ninth Circuit) in which a motion to dismiss was found to be appropriately granted where the issue was whether a product label is (or could be) deceptive or misleading to a reasonable consumer." <u>Culver</u>, 2021 WL 2943937, at *4 (collecting cases). For example, in <u>Blue Triton Brands</u>, 2022 WL 17061085, the plaintiff alleged that reasonable consumers would be misled into believing that Arrowhead brand spring water was sourced exclusively from springs in "Arrowhead Mountain." <u>Id.</u> at 1. Judge Staton summarized the holding of <u>Moore</u>, 4. F. 4th 874 as finding that "any ambiguity in the source of the honey would be dispelled for a reasonable consumer by context and other information on the packaging, including a rating reflecting the product's concentration of honey derived from the Manuka flower." <u>Id.</u> at *4. Applying <u>Moore</u> to the case at hand, <u>Blue Triton Brands</u> held that "any reasonable consumer who found the front of the package ambiguous as to the water's source would need only to look at the back of the package to find unambiguous language describing where the water came from. Mere references to a geographic location on the front of the packaging are not sufficient to mislead a reasonable consumer." <u>Id.</u> In <u>Culver</u>, 2021 WL 294393, the plaintiff alleged that Maille Old Style Mustard and Maille Dijon Originale Mustard, manufactured in Canada, would mislead consumers into believing they were manufactured in France, pointing to three primary elements of the front label: (1) the word Paris; (2) the words "Depuis 1747," and (3) the words "Que Maille." <u>Id.</u> at *1. The defendant argued, "while the Product labels were designed to evoke a French feel and pay homage to the history of the Maille brand, they do not mislead a reasonable consumer into believing the Products were actually produced in France. Further, if there was any confusion, . . . consumers could simply turn to the Products' rear labels, which clearly state the country of origin[.]" <u>Id.</u> The court agreed with the defendant, ultimately holding that "Defendant can use words and phrases on the front labels of its Products which properly and lawfully identify Maille as the source of the goods, where those words and phrases do not by themselves refer or mislead the consumer as to the Products' country of origin and where the rear label unmistakably identifies Canada as the location where the mustard is made." <u>Id.</u> at *8. It similarly distinguished <u>Williams</u>, 553 F.3d 934 because "there are no similar misleading elements," as "[t]he front labels of the Products do not state that the mustards were made in France or were even imported," whereas the French words and proper names on the front labels were either Defendant's trademarks or referenced the history of the Maille brand. That is not enough to make the labels so misleading that a reasonable consumer – who had a question as to the country of origin of the Products – would not be expected to look at the full packaging for the answer, which was clearly and correctly provided on the rear label." <u>Id.</u> These cases are consistent with the holdings of the vast majority of recent district court opinions, some of them cited above. <u>See, e.g.</u>, <u>Steinberg v. Icelandic Provisions, Inc.</u>, 2022 WL 220641 (N.D. Cal. Jan. 25, 2022) (holding that traditional Iceland dairy product, Skyr, produced by Icelandic Provisions would not mislead reasonable consumers where the front label stated "Icelandic Provisions and "Traditional Icelandic Skyr" and contained an "image of a countryside with a snow-covered backdrop" while the back label disclosed that it was manufactured in New York); <u>Maeda</u>, 407 F. Supp. 3d 953 (holding that Hawaiian branded snacks would not mislead reasonable consumers into believing they were manufactured in Hawaii where "mere evocation of Hawai'I" and "referencing or evoking the spirit of Hawai'I" is insufficient

to mislead a reasonable consumer); <u>Hodges v. King's Hawaiian Bakery W., Inc.</u>, 2021 WL 5178826 (N.D. Cal. Nov. 8, 2021) (holding that Original Hawaiian Sweet Rolls made in California would not mislead reasonable consumers because "mere use of a geographic reference, including a reference to the company's historical origin, does not convey a representation about a product's current origin" and the statement on the back label indicating the products are manufactured in California "is plainly sufficient to tell consumers where the sweet rolls are produced"); <u>Dumas</u>, 2016 WL 1367511 (holding that Jamican-style Red Stripe lager did not mislead reasonable consumers when it was manufactured in Pennsylvania, as "[t]he mere fact that the word 'Jamaica' and 'Jamaican' appear on the packaging is not sufficient to support a conclusion that consumers would be confused regarding the origin and ingredients of the beer" and the packaging indicated the place of manufacture); <u>Eshelby</u>, 2023 WL 2647958 (holding that L'Oréal products with "Paris" and French-language text on the front would not mislead reasonable consumers under California law because "[a]s a matter of law, a mere reference to Paris is insufficient to deceive a reasonable consumer regarding the manufacturing location of a product," "although a reasonable consumer may infer from the brand name that the company originated in Paris, a reasonable consumer would not also conclude that a particular product is manufactured in Paris, or elsewhere in France—particularly because each product also contains a disclosure on the back label stating the manufacturing location," and "the mere presence of words in a foreign language is insufficient to mislead a reasonable consumer").  To be sure, there are other cases that have come out the other way, but each of them contained far more specific and arguably misleading representations than those here, and virtually all of them were decided before <u>Moore</u>, 4. F. 4th 874.  <u>See, e.g.</u>, <u>Hesse v. Godiva Chocolatier, Inc.</u>, 463 F. Supp. 3d 453 (S.D.N.Y. 2020) (holding that plaintiffs stated a claim wherein Godiva Chocolatier's products were labeled "Belgium 1926" prominently on the front, as there was a "plausible inference [] that the phrase represents both the provenance of the company—Belgium, in 1926—and a representation that its chocolates continue to be manufactured there" and "Godiva does not explain why this latter inference is categorically unreasonable").

Indeed, a few months after the Ninth Circuit decided <u>Moore</u>, 4. F. 4th 874, this Court followed what now appears to be the prevailing view of district courts in dismissing a case that the plaintiffs described as "nearly indistinguishable" to the instant one.  <u>See</u> <u>Romero</u>, 2021 WL 6751908, at *4.  In <u>Romero</u>, the plaintiffs asserted that ice cream products, "Helados Mexico" and "La Michoacana" paletas, would mislead reasonable consumers into believing they were made in Mexico when they were manufactured in California.  <u>Id.</u> at *1.  The plaintiffs argued four features would deceive a reasonable consumer: (1) the Spanish name of the product, (2) a girl wearing a "traditional garment," (3) the use of "authentic Mexican flavors" and (4) the use of various Spanish words.  <u>Id.</u> at *4.  This court analyzed each of these elements in isolation and as a whole, finding that the products would not deceive reasonable consumers and dismissing the action without leave to amend.  <u>See</u> <u>id.</u> at *6.  While <u>Romero</u> also distinguished the facts of the instant action in various ways, the reality is that, based on the current state of the law, those aspects are distinctions without a legal difference.  Upon reconsideration, there is even a strong argument that the products at issue in <u>Romero</u> would be *more* likely to deceive a reasonable consumer than the Products here, for it is possible (though still implausible because of the surrounding context), that a consumer could associate "La Michoacana" with a specific place:

---

Michoacán, Mexico. See id. at *4. There is no such risk here, as the Products at most evoke the general "spirit or feeling," Dumas, 2016 WL 1367511, at *4, of Mexico, not any given locale.

Based on the authorities cited above, it is not surprising that another court faced with an identical, later-filed lawsuit held that the Products were not misleading as a matter of law. See Hardy v. Ole Mexican Foods, Inc., 616 F. Supp. 3d 247 (W.D.N.Y. 2022). Hardy concerned the same Products challenged here and virtually identical claims and arguments. See id. Although it applied New York, not California law, New York consumer protection claims are assessed under a "reasonable consumer" test that directly parallels the one applied here, and the Court finds no meaningful difference in the controlling precedents under Second Circuit and Ninth Circuit law applied by the Hardy court. See id. at 250-52. Hardy found that the "representations . . . say nothing about where the tortillas are made" and that Plaintiff's "assumptions after seeing Spanish words on the front packaging even though some words on the front of the package are in English" were unreasonable in light of the packaging as a whole. See id. at 252. That is because, "[a]t worst, the front-label representations are ambiguous as to where the tortillas are made, which is resolved after reading the clear country of manufacture on the back of the package." Id. Finding the front label at worst ambiguous, "as opposed to outright false," it held that a reasonable consumer must assess the packaging as a whole, and thus dismissed the action as a matter of law. See id. Hardy clearly stated that it has "considered and disagrees with" this Court's order in de Dios Rodriguez v. Ole Mexican Foods Inc., 2021 WL 1731604. Id. at 252. Today, this Court reconsiders its earlier analysis and follows Hardy.

Apart from the issues discussed above, there are other fundamental problems with the FAC, as the Court is not persuaded by the reasonableness of some of the pivotal assumptions on which this case, and other geographic origin false advertising lawsuits, are based. The Court discusses three of those issues below: (1) Plaintiff fails to properly allege a price premium for Mexican-made tortillas; (2) Plaintiff fails to adequately allege that other consumers care about whether their tortillas are made in Mexico; and (3) Plaintiff's assumptions about the "authenticity" of tortillas are unreasonable.

Plaintiff claims that she paid a price premium for tortillas purportedly made in Mexico. (See FAC ¶ 25) ("Plaintiff and other consumers have paid an unlawful premium for the Products. Plaintiff and other consumers would have paid significantly less for the Products had they known that the Products were not made in Mexico. In the alternative, Plaintiff and other consumers would not have purchased the Products at all had they known that the Products were not made in Mexico."). But at no point has Plaintiff alleged the price she paid for any of the Products, the prevailing market price for the Products, or the prices of any competitors (including similarly situated tortilla products that are made in the United States and Mexico), let alone any kind of non-conclusory assertion that companies really do attempt to charge more for tortillas made in Mexico. "The bare recitation of the word 'premium' does not adequately allege a cognizable injury." Naimi v. Starbucks Corp., 798 F. App'x 67, 70 (9th Cir. 2019) (holding claims were properly dismissed when "Plaintiffs did not allege how much they paid for the beverage, how much they would have paid for it absent the alleged deception, whether Starbucks (as opposed to a third-party distributor) was responsible for any overpayment, or any other

details regarding the price premium.").  A price premium theory could be a viable basis upon which to assert standing to challenge the Products, but it would have to be supported by factual allegations, not bare conclusions.  See Cahen v. Toyota Motor Corp., 717 F. App'x 720, 723-24 (9th Cir. 2017) (upholding dismissal of UCL, CLRA and FAL claims because the plaintiffs "have only made conclusory allegations that their cars are worth less" and thus their "economic loss theory is not credible," for they "have not, for example, alleged a demonstrable effect on the market for their specific vehicles based on documented recalls or declining Kelley Bluebook values"); Babaian v. Dunkin' Brands Grp., Inc., 2018 WL 11445613, at *7 (C.D. Cal. June 12, 2018) (finding plaintiff failed to plead economic injury even though he listed several competitors offering the same products with the "real" ingredient, which nonetheless failed to establish "that a price premium attaches to the Class Products due to the alleged misrepresentation.  That is, the mere fact that competitors sell products with real blueberry and maple ingredients is inapposite to whether Dunkin' extracted a price premium by selling the Class Products with artificial blueberry and maple while representing that they contain blueberry and maple.").

The Court is not persuaded by an unstated assumption in the FAC, at least without any factual detail in support of the contention: that a significant percentage of reasonable consumers care about whether the tortillas they buy in an American grocery store are made in Mexico or the United States.  Plaintiff alleges that she cared about whether tortillas were manufactured in Mexico (see FAC ¶ 9) but seeks to represent an exceptionally broad class: "all California citizens who, within the relevant statute of limitations periods, purchased any of the Products" (id. ¶ 27), regardless of whether these consumers care about whether the Products came from Mexico.  But Plaintiff fails to connect her subjective worldview to any other individual or establish that reasonable consumers share in it.  Based on its experience and common sense, the Court doubts that a significant share of reasonable consumers myopically focus on where tortillas are produced, for as explained above and below, the precise location of a factory or distribution center is of limited value in determining the quality, value or "authenticity" of a product.  As such, the FAC suffers from the same "insurmountable problem" as in Culver, 2021 WL 2943937, wherein the plaintiff "fail[ed] to establish or aver that all (or even a significant percentage of) California consumers of the Products really care where the mustards were manufactured.  Likewise, there is nothing to indicate to what extent, if any, reasonable consumers would rest their mustard purchasing decisions on whether the condiment was made in France – as opposed to Canada or any other country.  While the Court would concede that there are undoubtedly some consumers who actually are concerned with the country of origin as to their mustard goods, Culver does not appear to be bringing this lawsuit on behalf of that limited subset of mustard purchasers but rather is litigating this action for all buyers of Defendant' Products."  Id. at *7.  There are thus two fundamental points of dislocation between Plaintiff's allegations and any basis for classwide relief: she fails to connect her subjective views on geographic origin to that of "reasonable consumers," and fails to connect her views to any basis for putative classwide relief.

Finally, Plaintiff has distorted the concept of "authenticity" in the search for a theory of economic injury to such an extent that it is no longer credible.  At their core, the claims raised here and in similar lawsuits are rooted in the premise that consumers place a higher value on foreign-seeming products in the search of "authenticity."  (See, e.g., FAC ¶¶ 3-4).  This is an

empirical proposition that may or may not be true, or may be true in some ways and not others, that the Court cannot resolve at the pleadings stage. For now, it is willing to assume that this is how some consumers think. But the Court need not, and does not, assume the reasonableness of this line of thought within the instant factual context, at least when taken to the logical extreme demanded by Plaintiff. To begin, it is not reasonable to assume that potential consumers for Defendant's products are seeking out the most traditional of tortillas, for they are buying them at "grocery retailers in California." (Id. ¶ 11.) No matter how saturated American culture is with the "staged authenticity" and "voyeuristic experiences" of an idealized, romantic version of Mexico found in advertising or various restaurants, see Sarah Portnoy, *Good Food and the Problematic Search for Authenticity*, KCET (Nov. 6, 2017), https://www.kcet.org/shows/the-migrant-kitchen/good-food-and-the-problematic-search-for-authenticity, no reasonable consumer would think that she is buying tortillas handmade by someone's *abuela* in Mexico by simply looking at how the Products are packaged. Plaintiff appears to assert that a substantial percentage of the putative class is composed of Latino consumers, for she argues elsewhere that "Olé . . . implements a targeted advertising and marketing campaign designed to resonate with the Hispanic community, with the primary focus of convincing consumers that the Products are manufactured in Mexico." (Motion for Class Certification at 4.) But anyone with a basic familiarity with Mexican culture, including many or most Mexican Americans living in the United States, knows that the vast majority of Mexicans acquire their tortillas at *tortillerias*, and no *tortilleria* would package their products in a manner remotely similar to the Products. The Products also do not look like mass-produced tortillas sold in Mexican grocery or convenience stores, not least because they are mostly written in English, not Spanish.

More fundamentally, Plaintiff fails to demonstrate that her theory of "authentic" food is anything more than a subjective viewpoint, rather than an objectively reasonable or widely shared position. Authenticity is a social construct. "[A]uthenticity is not a quality inherent to food: it is one that is socially and personally constructed. It varies depending on available ingredients, changes in technology, social class and the influences of trade and travel." Portnoy, *supra*. As numerous scholars, chefs, cultural commentators and others have observed, Mexican cuisine was transformed in various ways throughout the 21st century by the experience of Mexican immigrants arriving into the United States, as they adapted to the unavailability of some familiar ingredients and the availability of others, as well as the tastes of American consumers. See id. This process of "transculturation," or the merging and converging of cultures, is present in many cuisines and has been heavily influenced by colonial history. Id. For instance, traditional Italian foods are "inextricably linked to the tomato," but tomatoes only arrived in Europe from the Americas in the 16th century; ramen arrived in Japan in the 19th century because of Chinese tradesmen; and pho soup was heavily influenced by French colonial rule in Vietnam. See id. Since this case is brought on behalf of purportedly reasonable *California* consumers, Californians will have at least a basic understanding of this idea: many food purveyors in California, although different from one what might expect to see in Mexico, nonetheless provide "authentic representations of what Mexican food has evolved into over centuries of Mexican presence" in California, as the late Pulitzer Prize-winning food critic Jonathan Gold has explained. See id. Moreover, as critic E.N. Anderson has theorized, "labels for cuisines are 'notoriously ambiguous' since it is not possible to define foodways by national borders. Rather, there is

'constant influence and borrowing' between countries that border each other, such as the United States and Mexico." Id.  Others have explained that "Mexican food in all its manifestations is just a tasty extension of what the legendary Chicano scholar Américo Paredes once deemed 'Greater Mexico:' the idea that Mexico and its culture doesn't stop at the border." Id.  The bottom line is that "affixing the label of authenticity to a cuisine is problematic because it suggests that cultural purity is the norm," when it is not. Id.  While foods may be more or less "authentic" according to some subjective view as to how closely they adhere to traditional methods of preparation or ingredients from a nation of origin, it is false to suggest that any foods made or manufactured in the United States cannot be "authentically" Mexican—millions of Mexican Americans carrying on the legacies of their Mexican ancestors from within the borders of the United States would beg to differ.  It is also equally false to say that all foods manufactured in Mexico are authentically Mexican, for many products made there have been materially influenced by other cultures, not least that of its neighbor to the north.  There are also distinct forms of Mexican American culture, and cuisine, that can be equally "authentic," or inauthentic, depending on one's view.  And of course, American, Mexican and Mexican American cultures, traditions and cuisines are not monolithic, for each contain regional variations and specialties.  Above all, it is false to state that all Mexican or Mexican-style food made in Mexico is inherently superior to all Mexican or Mexican-style food made in the United States, simply based on some dubitable and subjective conception of "authenticity."  There are other, more salient representations of the value of a food:  its taste, texture and appearance, its link to the *terroir* (the soil and climate in which it is grown), the freshness of ingredients, the skill and thoughtfulness of its preparation, its price weighed against its quality, and so forth.  Reasonable tortilla consumers care about whether their tortillas are good—and that is not the same thing as caring solely about whether their tortillas are made in Mexico.

The corollary of the "authenticity" premise is that companies like Defendant have engaged in "deceptive practices" (FAC ¶¶ 3-4) by deliberately seeking to mislead consumers with packaging that evokes a foreign culture, even though the product is manufactured in the United States.  But why is that necessarily so?  On an objective basis, there is nothing inherently false or misleading about selling tortillas in a way that highlight their "Mexicanness."  Tortillas *are* Mexican.  They are also no more, or no less, part of American culture or the American economy because they are Mexican.  And as to subjective intent, food producers like Olé can believe in good faith that they are selling "Mexican" foods produced in the United States.  There is nothing inherently contradictory about this.  An individual can be proud to be an American while simultaneously acknowledging, and celebrating, her Mexican heritage; a company can be based in the United States with a corporate culture that acknowledges, and celebrates, Mexican culture and cuisine.  By implicitly rejecting these ideas, lawsuits like this one perpetuate an unfortunate, and unreasonable, undercurrent of essentialism: that foreign-sounding people, words and foods are less American than the people, language and cuisine associated with the "real" America.  If a consumer begins with the presumption (seemingly an unrebuttable one if she is also unwilling to look at the back of a package to see if it is made in the United States) that all ethnic food products she finds in an American grocery store are manufactured in a foreign country because they are inherently "foreign," she fundamentally misunderstands the American experience.  For purposes of a FAL, CLRA or UCL claim, she is also not a reasonable consumer,

as "a plaintiff's own 'unreasonable assumptions' about a product's label or desire to take the label out of 'its proper context' will not suffice." Corpus, 2023 WL 2292579, at *4.

At the end of the day, Plaintiff's theory of the case is inherently implausible. Some tortillas are made in Mexico. Some tortillas are made in the United States. Good tortillas are made in Mexico. Bad tortillas are made in Mexico. Good tortillas are made in the United States. Bad tortillas are made in the United States. Reasonable consumers know this. Some consumers care about where their tortillas are made. No such individual would be so convinced of the Mexican origin of the Products from their front labels that she would ignore the back label. Thus, anyone who cared about whether the Products were made in Mexico would read their back label and see for themselves they are made in the United States. See Culver, 2021 WL 2943937, at *9 ("The front labels of the Products do not state that the mustards were made in France or were even imported. The two French words and the two proper names on the front labels were either Defendant's trademarks or referenced the history of the Maille brand. That is not enough to make the labels so misleading that a reasonable consumer – who had a question as to the country of origin of the Products – would not be expected to look at the full packaging for the answer, which was clearly and correctly provided on the rear label."). For these reasons, the Court finds that the FAC fails to allege "a probability 'that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled.'" Ebner, 838 F.3d at 965 (citation omitted). As such, Plaintiffs' first, second and third causes of action fail under the reasonable consumer test and are subject to dismissal on that basis.

## C. Fourth Cause of Action: Implied Warranty

Under California law, "a warranty that the goods shall be merchantable is implied in a contract for their sale." Cal. Com. Code § 2314(1). California recognizes an exception to the privity requirement in breach of warranty claims pertaining to food or drug products. Wendell v. Johnson & Johnson, 2010 WL 271423, at *5 (N.D. Cal. Jan 20, 2010) (citing Gottsdanker v. Cutter Labs., 182 Cal. App. 2d 602 (1960)). The California Supreme Court has explained that "[m]erchantability has several meanings, two of which are relevant to the instant case: the product must '[conform] to the promises or affirmations of fact made on the container or label,' and must be 'fit for the ordinary purposes for which such goods are used.'" Hauter v. Zogarts, 14 Cal. 3d 104, 117 (1975).

In Plaintiff's fourth cause of action, she alleges that Defendant breached an implied warranty of merchantability on the same theory as that discussed above: "By advertising the Products with their current packaging, Defendant made an implied promise that the Products are made in Mexico. The Products have not 'conformed to the promises . . . made on the container or label' because they are not made in Mexico. Plaintiff, as well as consumers, did not receive the goods as impliedly warranted by Defendant to be merchantable." (FAC ¶ 85.) This Court has already explained why a virtually identical implied warranty claim fails: "As the Court stated above, the product's packaging does not include representations that would mislead a reasonable consumer that the products were made in Mexico. As a result, there are no representations of promises or affirmations of fact that the products were made in Mexico. Thus, Plaintiffs have

failed to allege a claim for implied breach of merchantability." <u>Romero</u>, 2021 WL 6751908, at *7; <u>see also</u> <u>Broomfield</u>, 2017 WL 3838453, at *11 ("Because the Court finds that the Hawaiian address, map and brewery invitation on the Kona beer packaging does not establish a promise sufficient to establish an express warranty, the Court also finds that the implied warranty of merchantability claim is insufficiently pled."); <u>cf.</u> <u>LeGrand v. Abbott Lab'ys</u>, 2023 WL 1819159, at *14 (N.D. Cal. Feb. 8, 2023) (finding implied warranty claim sufficiently pled where false advertising and express warranty claims were also sufficiently pled). As such, the Court DISMISSES Plaintiff's fourth cause of action.

Because the Court finds the FAC subject to dismissal in its entirety on the above grounds, the Court need not reach Defendant's additional arguments for dismissal of claims and allegations raised by the Motion: that Plaintiff has failed to plead privity, does not have standing to assert class allegations, and fails to plead facts supporting a claim for punitive damages. (<u>See</u> Motion at 11-14.) <u>See</u> <u>Workman v. Plum Inc.</u>, 141 F. Supp. 3d 1032, 1037 (N.D. Cal. 2015) (holding that plaintiff failed to state a claim under the reasonable consumer test and declining to reach additional argument for dismissal, including standing).

**D. Leave to Amend**

The only remaining question is whether to dismiss the FAC with or without leave to amend. Plaintiff has already amended the pleadings, while this case has been pending since November 6, 2020. Allowing further amendment would cause needless delay to this already protracted litigation. More importantly, the deficiencies discussed above cannot be cured by pleading additional or different facts, for Plaintiff's claims fail as a matter of law based on an assessment of the Products' packaging as a whole, which cannot be changed through amended pleadings. <u>See</u> <u>Moore</u>, 4 F. 4th at 886 (upholding dismissal of complaint in its entirety without leave to amend because "Plaintiffs have not alleged, and cannot allege, facts to state a plausible claim that Trader Joe's Manuka Honey is false, deceptive, or misleading"); <u>Davis</u>, 693 F.3d at 1171 (upholding dismissal of complaint in its entirety, including FAL and UCL claims, with prejudice); <u>Ebner</u>, 838 F.3d at 966-68 (upholding dismissal of UCL, CLRA and FAL claims with prejudice); <u>Steinberg</u>, 2022 WL 220641, at *8 (N.D. Cal. Jan. 25, 2022) ("Because the Court concludes that further amendment would be futile, given the implausibility of her deceptive labeling claims, Steinberg is not given leave to amend"); <u>Macaspac v. Henkel Corp.</u>, 2018 WL 2539595, at *6 (S.D. Cal. June 4, 2018) ("No amount of additionally pleaded facts could change the features of the Purex bottles that render them non-deceptive. The Court accordingly denies leave to amend and dismisses the complaint with prejudice."); <u>Workman</u>, 141 F. Supp. 3d at 1037 ("[A]s this order finds that the labels at issue are not deceptive, and the labels themselves cannot be changed by a new complaint, any amendment would be futile."). The Court dismisses the FAC in its entirety WITHOUT LEAVE TO AMEND.[4]

---

[4] Plaintiff does not argue in the Opposition that the Court should consider a survey purportedly suggesting that some percentage of consumers would be misled by the Products, nor would that be proper or change any conclusion reached here. Plaintiff "did not reference or rely on the results of this survey in drafting her complaint and did not attach any survey results to her

Because the Court holds that all of Plaintiff's claims fail as a matter of law, all pending matters in this action are moot.  The Court DENIES AS MOOT the Application to File Under Seal, Motion for Class Certification and Motion to Exclude.

## V.   CONCLUSION

For the reasons above, the Court **GRANTS** the Motion and **DISMISSES** the FAC in its entirety **WITHOUT LEAVE TO AMEND**.  The Court **DENIES AS MOOT** the Application to File Under Seal, Motion for Class Certification and Motion to Exclude.  The May 22, 2023 hearing is **VACATED**.  The Clerk is directed to close the case.

**IT IS SO ORDERED.**

---

complaint.  The survey results, therefore, shall not be considered on a motion to dismiss." Eshelby, 2023 WL 2647958, at *5.  "And, to the extent [Plaintiff] requests leave to amend her complaint to add additional allegations about the results of this survey, . . . such amendment would be futile.  A plaintiff cannot rely solely on consumer surveys to state a claim." Id. (citing Becerra, 945 F.3d at 1231).  More importantly, the Court finds that the defects in Plaintiff's proposed survey are so fundamental that they cannot salvage her claims.  Among the critical problems, Plaintiff's expert deliberately designed the survey to show only portions of the Products' packaging to participants, and to exclude the parts where they say they are made in the United States.  A participant would have to click on a tiny and difficult-to-find link to view any additional images, and nowhere do the survey results show whether or how many participants did so.  (See Class Certification Opposition Ex. 4, Attachment D to the Declaration and Expert Report of J. Michael Dennis, Ph.D., Dkt. No. 87-7; Motion to Exclude.)  Courts routinely find that such surveys are unreliable and cannot be a basis upon which to state a claim.  See, e.g., Eshelby, 2023 WL 2647958, at *5 ("The defects in Eshelby's survey cannot salvage her claims.  The survey only showed respondents the front of the product, which does not contain the disclaimer stating the country of manufacture"); Cheslow v. Ghirardelli Chocolate Co., 472 F. Supp. 3d 686, 695 (N.D. Cal. 2020) ("[T]he survey only showed respondents the front panel of the product . . . . By omitting the back panel, the survey deprived respondents of relevant information . . . . Because the survey . . . omit[s] the back panel . . . it cannot transform plaintiff['s] unreasonable understanding concerning [the product] into a reasonable one."); Culver, 2021 WL 2943937, at *12 (finding survey methodology unreliable because it imposed multiple "unreasonable impediments to viewing the back label of the Products").  Another central problem is that the survey fails to provide adequate factual detail as to why a consumer might believe the Products were made in Mexico.  See Culver, 2021 WL 2943937, at *13 (finding survey inadequate where "[t]he central question on the survey simply asks participants, after they are shown a number of images, where they believe the product was made" and "fails to ask the respondents essential follow-up questions such as '[w]hat is the basis for your belief?").  As such, "[e]ven if some respondents in a survey were to say that they assumed that the Products were made in [Mexico] . . . that still would not be adequate to salvage the deficiencies of [Plaintiff]'s CLRA, FAL and UCL claims." Id.

---